JUDGE CAPRONI

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

14  CV  1749

| | |
|---|---|
| ANDREW LAWRENCE HOSKING and SIMON JAMES BONNEY, in their capacity as joint compulsory liquidators and duly authorized foreign representatives of HELLAS TELECOMMUNICATIONS (LUXEMBOURG) II SCA, | Civ. No. _____ |

Plaintiffs,

-against-

**JURY TRIAL DEMANDED**

RECEIVED

MAR 13 2014

U.S.D.C.S.D.N.Y.
CASHIERS

TPG CAPITAL MANAGEMENT, L.P., f/k/a TPG CAPITAL, L.P., DAVID BONDERMAN, JAMES COULTER, TPG CAPITAL, LLP, f/k/a TEXAS PACIFIC GROUP EUROPE, LLP, APAX PARTNERS LLP, MARTIN HALUSA, APAX PARTNERS, L.P., APAX WW NOMINEES LTD., TPG ADVISORS IV, INC., TPG GENPAR IV, L.P., TPG PARTNERS IV, L.P., T3 ADVISORS II, INC., T3 GENPAR II, L.P., T3 PARTNERS II, L.P., T3 PARALLEL II, L.P., APAX PARTNERS EUROPE MANAGERS LTD., APAX EUROPE VI GP CO. LTD., APAX EUROPE VI GP, L.P., a/k/a APAX EUROPE VI GP L.P. INC., APAX EUROPE VI-A, L.P., APAX EUROPE VI-1, L.P., TCW/CRESCENT MEZZANINE PARTNERS III NETHERLANDS, L.P., a/k/a TCW/CRESCENT MEZZANINE PARTNERS NETHERLANDS III, L.P., TCW/CRESCENT MEZZANINE PARTNERS III, L.P., a/k/a TCW/CRESCENT MEZZANINE FUND III, L.P., TCW/CRESCENT MEZZANINE TRUST III, TCW/CRESCENT MEZZANINE III, LLC, TCW ASSET MANAGEMENT COMPANY, TCW GROUP INC., and DOES 1-25, on behalf of themselves and a class of similarly situated persons and legal entities,

-and-

NIKESH ARORA and DEUTSCHE BANK AG,

Defendants.

**COMPLAINT**

## TABLE OF CONTENTS

Page

NATURE OF THE ACTION ................................................................................................... 1

JURISDICTION AND VENUE .............................................................................................. 6

THE PARTIES ......................................................................................................................... 6

    A.    The Plaintiffs ................................................................................................................ 6

    B.    The TPG and Apax Defendants .................................................................................... 8

    C.    The TPG Capital Defendants ........................................................................................ 8

    D.    The Apax Partners Defendants ................................................................................... 11

    E.    The Sponsors Including Defendant Apax WW Nominees Ltd. ................................... 13

    F.    The TPG Advisors IV Defendants .............................................................................. 16

    G.    The T3 Advisors II Defendants ................................................................................... 17

    H.    The Apax Europe VI Defendants ............................................................................... 18

    I.    The Investor Defendants .............................................................................................. 20

    J.    The Additional Defendants .......................................................................................... 23

CLASS ALLEGATIONS ....................................................................................................... 24

FACTUAL BACKGROUND ................................................................................................. 26

    A.    TPG and Apax Load the Company with Debt to Finance the
          Leveraged Buyout of Greek Telecommunications Company TIM Hellas ................... 26

    B.    The Company Issues 490,000 CPECs with a Combined Par Value
          of €49 Million in Connection With the Acquisition of TIM Hellas ............................ 31

    C.    TPG and Apax Use the Company to Acquire Greek Telecommunications
          Company Q-Telecom, and the Company Incurs Even Greater Debt ........................... 33

    D.    TPG and Apax Extract Nearly All of the Funds they Contributed to the
          TIM Hellas and Q-Telecom Acquisitions, Leaving Behind Still More Debt ............. 35

    E.    Dissatisfied with the Results of an Auction to Sell the Company, TPG
          and Apax Hatch a Scheme to Pay Themselves a Windfall from Borrowed Funds ..... 36

    F.    TPG and Apax Use the Company to Borrow More than €1.4 Billion, Proceeds of
          which are Siphoned Out of the Company by an Improper Redemption of CPECs ...... 38

    G.    TPG and Apax Wash Their Hands of the Company, which
          Staggers Toward Bankruptcy Under its Crushing Debt Burden .................................. 48

FIRST CAUSE OF ACTION (Actual Fraudulent Conveyance)................................................. 53

SECOND CAUSE OF ACTION (Constructive Fraudulent Conveyance)................................. 55

THIRD CAUSE OF ACTION (Unjust Enrichment)................................................................. 57

RELIEF REQUESTED............................................................................................................ 58

Andrew Lawrence Hosking and Simon James Bonney, in their capacity as Joint Compulsory Liquidators ("Plaintiffs" or "Joint Compulsory Liquidators") and duly authorized foreign representatives, as defined by 11 U.S.C. § 101(24), of Hellas Telecommunications (Luxembourg) II SCA (the "Company"), by and through Chadbourne & Parke LLP as against all defendants except Deutsche Bank AG and Nikesh Arora, and by and through Wolf Haldenstein Adler Freeman & Herz LLP solely as against defendants Deutsche Bank AG and Nikesh Arora, respectfully allege as follows:

## NATURE OF THE ACTION

1.      The Joint Compulsory Liquidators bring this action for the benefit of the Company's estate and its creditors to obtain redress for one of the very worst abuses of the private equity industry.  The defendants include certain entities and individuals comprising and affiliated with TPG and Apax (as defined below), two of the largest private equity firms operating in the United States and around the globe.  TPG and Apax used the Company to carry out the highly leveraged acquisition of a pair of Greek businesses, before causing the Company to borrow well in excess of €1 billion in additional funds that were then immediately siphoned out of the Company without consideration.  Less than two months after that fraudulent transfer, TPG and Apax disposed of the Company and its subsidiaries, pocketing a windfall and leaving behind an insolvent Company staggering toward bankruptcy.  Consistent with their code names for the initial transactions through which they later secured their windfall, TPG's and Apax's duplicitous and catastrophic plunder of the Company is evocative of the sack of Troy.

2.      In 2005, TPG and Apax pursued acquisitions of TIM Hellas and Q-Telecom (as defined below), the third- and fourth-largest mobile telecommunications providers in Greece, respectively.  TPG and Apax internally dubbed their acquisition plans for those two companies

"Project Troy" and "Project Helen."  By press release on April 4, 2005, they announced their intent to acquire a controlling stake in their first target, TIM Hellas.  At the time, Philippe Costeletos, a partner of and lead member of the deal team for TPG, promised that they "remain[ed] committed to providing management with the resources necessary to invest in infrastructure, provide innovative products and services to customers, and continue to grow the business."  For his part, Giancarlo Aliberti, a lead member of the Apax partnership and of its deal team, welcomed this "great opportunity" to "work with TIM Hellas' management to create value and help the company realize its growth potential," and to begin "investing in TIM Hellas' future and building on its strengths."  Those promises and commitments were quickly betrayed.

3.     By January 31, 2006, TPG and Apax had acquired 100% interests in both TIM Hellas and Q-Telecom, using the Company and other special-purpose entities organized in Luxembourg and Greece as vehicles to obtain and hold those interests.  Approximately one year later, in February 2007, TPG and Apax announced their final sale of the Company and its subsidiaries, including TIM Hellas and Q-Telecom, realizing an overall return on their original investment of nearly 375%.

4.     In glossy marketing materials published early the following year, Apax boasted that the "Apax Fund and its investment partner TPG backed a strong management team which successfully turned [TIM Hellas] around and put it on a growth footing through investment and a series of initiatives."  According to Apax, TIM Hellas "was further bolstered by the acquisition of . . . Q-Telecom" and "[t]he combined business continued to exceed expectations throughout 2006."  Moreover, when TPG and Apax sold that business in February 2007, they purportedly left behind "a robust company with genuine further growth prospects."

2

5.      In the light of day, however, "Project Troy" and "Project Helen" can be seen for what they were – a state-of-the-art Trojan Horse designed to financially infiltrate TIM Hellas and Q-Telecom and then systematically pillage their assets from within by piling on debt in order to make large distributions to the equity owners.  All the while, and even after the Company had been left insolvent, TPG and Apax shamelessly collected millions of euro from the Company in "consulting fees" and for "business advisory services."

6.      As reported by the Daily Telegraph in a January 7, 2012 article bearing the headline "How Private Equity Plundered Profitable Greek Telecoms Company Hellas," although "[t]here are plenty of examples of where private equity bought companies, over-leveraged them and left them facing potential collapse," "rarely have they been quite as big and left as bad a taste in the mouth as Hellas."  The New York Times, in a March 13, 2010 article entitled "Private Equity's Trojan Horse of Debt," similarly reported that TPG and Apax had "larded Wind Hellas with debt before selling it off" in "yet another tale for our times."  This sordid tale resulted in the Company's creditors, located in the United States, including New York, and worldwide, paying the price for the unwarranted bounty enjoyed by the departing private equity owners.

7.      To minimize their own exposure, TPG and Apax contributed only €390 million, or less than 20% of the approximately €1.98 billion in total consideration and transaction costs necessary to acquire both TIM Hellas and Q-Telecom.  They used the Company and its subsidiaries to borrow the lion's share of the necessary funds, leaving the newly acquired businesses highly leveraged from the outset.  Upon its acquisition by TPG and Apax, the total third- and related-party debt of TIM Hellas increased from €186.9 million as of December 31, 2004, to €1.66 billion as of December 31, 2005, resulting in an increase from 1.3x to 17.6x in the ratio of debt to earnings before interest and taxes ("EBIT").  Thus, its leverage not only had

increased relative to its historical levels but also leaped past others in the industry, to more than seven times the debt-to-EBIT ratio of competitors Vodafone Group PLC and Cosmote SA.

8.     Upon taking control of TIM Hellas and Q-Telecom, TPG and Apax promptly inserted their own personnel in key management positions at all levels.  By no later than June 2006, and at the behest of TPG and Apax, the Company's management began searching the market for a buyer to whom their recent prizes could be "flipped" for a quick profit.

9.     In the meantime, in April 2006 an affiliate of the Company borrowed an additional €500 million, of which more than 75%, or approximately €376.6 million, was used to make payments to TPG and Apax.  Thus, in a matter of months, TPG and Apax had recouped over 90% of their original investment.  But they wanted a much richer return.

10.     On or about December 8, 2006, TPG and Apax abandoned an auction that had failed to produce a buyer willing to pay their €3.5-4.0 billion price tag for the Company's subsidiaries.  Within a matter of weeks, TPG and Apax hatched a scheme to extract nearly €1 billion in additional funds borrowed by the Company.  This brazen scheme was executed on December 21, 2006.  TPG and Apax used the Company to borrow €960 million and $275 million and issue subordinated notes (the "Sub Notes"), of which approximately 30% was held by investors in New York alone.  The Company then transferred approximately €1.57 billion to its parent holding company, which included *all* of the proceeds from the Sub Notes, together with additional funds borrowed from the Company's subsidiaries and affiliates.  €978.7 million of those transferred funds were then funneled upward to TPG and Apax (of which €5 million was used to pay advisor fees).

11.     The €978.7 million cash payment ostensibly was made by the Company in redemption   of   so-called   convertible   preferred   equity   certificates   ("CPECs")   (the

"December 2006 CPEC Redemption") that the Company had issued in 2005 and early 2006 in connection with its receipt of €77.3 million in contributions by TPG and Apax toward the acquisition of TIM Hellas and Q-Telecom. The majority of those CPECs already had been redeemed at par and the contributions recouped by TPG and Apax earlier that year. Of the remaining 33.8 million CPECs, 27.3 million with a par value of €1 per CPEC were now redeemed at a premium of €951.3 million – *more than 35 times par* – in order to enrich the Company's ultimate equity owners. Put another way, the €27.3 million aggregate par value of the redeemed CPECs accounted for less than 2.8% of the €978.7 million paid out by the Company.

12.     The offering materials for the Company's issuance of the Sub Notes euphemistically described this CPEC redemption as a repayment of "deeply subordinated shareholder loans." But those CPECs were not "loans" and their redemption in no way reduced the debt burden on the highly leveraged Company. The CPECs carried no interest, required no periodic payments, and would only be required to be redeemed, if ever, at their maturity in 30 years and at par value of €1 per CPEC.

13.     Indeed, by their terms, the CPECs could not be redeemed, even at maturity, if such redemption would leave the Company insolvent, or if the Company had not paid or provided for all of its other obligations. Moreover, the terms of the CPECs – not to mention the fiduciary obligations of the Company and its management – *prohibited* any redemption of CPECs prior to the maturity date except to distribute proceeds from the Company's sale of one of its subsidiaries or the operating revenues of such subsidiaries. None of the preconditions for a CPEC redemption had been satisfied, let alone one carried out at a preposterous multiple of 35 times par.

14.     Based on these and other facts, it is apparent that the Company's December 2006 CPEC Redemption was carried out with the fraudulent intent to hinder, delay and/or defraud the Company's creditors, and in particular the holders of the Sub Notes.   Moreover, the December 2006 CPEC redemption left the Company insolvent, with unreasonably small capital with which to conduct its business, and unable to pay its debts as they matured, while unjustly enriching TPG and Apax at the expense of the Company and its creditors.  This action is brought to remedy those wrongs.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 11 U.S.C. §§ 1509(b)(1) and (b)(2), 11 U.S.C. §§ 1521(a)(5) and (a)(7), and 28 U.S.C. § 1334.

16.     Venue is properly located in this District pursuant to 28 U.S.C. § 1409(a).

## THE PARTIES

**A.     The Plaintiffs**

17.     Plaintiffs are the Joint Compulsory Liquidators of the Company, whose petition for the entry of an Order Granting Recognition of a Foreign Main Proceeding and Related Relief was granted by the United States Bankruptcy Court for the Southern District of New York on March 14, 2012 (the "Recognition Order").  A copy of the Recognition Order is attached hereto as Exhibit A.   By a decision dated November 30, 2011, and given effect by Order dated December 1, 2011, the High Court of Justice of England and Wales (the "High Court") had directed that the Company should be wound-up through a compulsory liquidation.   Andrew Lawrence Hosking and Carl Stuart Jackson were then appointed by the United Kingdom's Secretary of State for Trade and Industry as the Company's Joint Compulsory Liquidators, as of December 5, 2011.  Mr. Jackson was subsequently replaced in his capacity as one of the Joint

6

Compulsory Liquidators by Simon James Bonney, who was appointed pursuant to an Order of the High Court dated May 17, 2013.

18.     Previously, on December 16, 2011, the Joint Compulsory Liquidators commenced two actions in the District Tribunal of Luxembourg (the "Luxembourg Actions"), alleging in part that the Company's redemption of CPECs held by Hellas Telecommunications I, S.à.r.l. ("Hellas I"), on or about December 21, 2006, constituted an improper dividend to shareholders in violation of certain provisions of the Luxembourg Companies Law.  The Luxembourg Actions in part seek a judgment of damages against Hellas I, Hellas Telecommunications, S.à.r.l. ("Hellas"), and each of the members of the Board of Managers of Hellas at the time of that dividend, namely Giancarlo Aliberti, Maurizio Bottinelli, Matthias Calice, Philippe Costeletos, Guy Harles, and Benoit Duvieusart.  None of the causes of action asserted in the Luxembourg Actions is asserted in this action.  None of the defendants named in the Luxembourg Actions is a party to this action.  The Luxembourg Actions remain pending as of the date of filing of this Complaint.

19.     The Joint Compulsory Liquidators have been granted standing and authority under the laws of England and Wales by a duly formed liquidation committee of the unsecured creditors of the Company (the "Liquidation Committee") to pursue the claims asserted in this Complaint.  On September 3, 2013 and February 20, 2014, the Liquidation Committee adopted certain resolutions including approval of the exercise by the Joint Compulsory Liquidators of all the powers available under Schedule 4 of the Insolvency Act 1986.  The powers available to the Joint Compulsory Liquidators pursuant thereto include without limitation the power to prosecute, settle, or otherwise resolve causes of action that the Company or its creditors may possess, including those asserted herein, in any jurisdiction.

**B.    The TPG and Apax Defendants**

20.    "TPG" refers collectively to all of the entities and individuals named as defendants and defined below as the TPG Capital Defendants, the TPG Advisors IV Defendants, and the T3 Advisors II Defendants.

21.    "Apax" refers collectively to all of the entities and individuals named as defendants and defined below as the Apax Partners Defendants, Apax Nominees, and the Apax Europe VI Defendants.

**C.    The TPG Capital Defendants**

22.    Defendant TPG Capital Management, L.P., formerly known as TPG Capital, L.P. ("TPG Capital"), is a limited partnership registered under the laws of Texas, with its principal place of business located at 301 Commerce Street, Suite 3300, Fort Worth, Texas.  TPG Capital was founded in 1992 by defendants David Bonderman and James Coulter.  Today, TPG Capital is a global private equity firm that manages a wide range of investment funds and operates from 18 offices located in 12 countries and 5 continents.  Those 18 offices include four located in the United States, with one located at 888 7th Avenue, New York, New York, and occupied by affiliate TPG Capital-New York, Inc., a Texas corporation registered to do business in New York, and also include one office located in London, England and occupied by affiliate and defendant TPG Capital, LLP.

23.    The funds owned, controlled, and/or advised by TPG Capital have a total of at least $59 billion of capital under management, which was raised from investors located in the United States, including New York, and around the world.  Those funds include, for example, the T3 Partners II, T3 Parallel II, and TPG Advisors IV funds, the last of which alone raised at least $5.8 billion from such investors.

8

24.     The New York and U.S. investors in the TPG Advisors IV fund include, for example, Bristol-Myers Squibb Company, a Delaware corporation registered to do business in New York with its principal executive office located at 345 Park Avenue, New York, New York, which invested approximately $10 million in defendant TPG Partners IV, L.P.  Moreover, the New York State Teachers' Retirement System has its principal place of business located at 10 Corporate Woods Drive, Albany, New York, and invested approximately $100 million in defendant TPG Partners IV, L.P.  The New York State Common Retirement Fund has its principal place of business located at 110 State Street, Albany, New York, and likewise invested approximately $75 million in defendant TPG Partners IV, L.P.

25.     TPG Capital provides investment advisory services to certain of the funds it manages.  In particular, and upon information and belief, TPG Capital advises the TPG Advisors IV, T3 Partners II, and T3 Parallel II funds.  Upon information and belief, TPG Capital received, directly or indirectly from one or more of the Sponsors (as defined below), cash proceeds from the December 2006 CPEC Redemption.

26.     Defendant David Bonderman is the President of TPG Capital.  Mr. Bonderman resides in Fort Worth, Texas and conducts business from locations including TPG Capital's offices located at 301 Commerce Street, Suite 3300, Fort Worth, Texas.  Mr. Bonderman travels to New York on various occasions including to conduct business for TPG Capital.  As of March 2014, Forbes reports that Mr. Bonderman has a net worth of approximately $2.7 billion.

27.     As described further below, Mr. Bonderman is an officer and director of defendants TPG Advisors IV, Inc. and T3 Advisors II, Inc., and he and Mr. Coulter are the sole shareholders of TPG Advisors IV, Inc. and T3 Advisors II, Inc.  Upon information and belief,

Mr. Bonderman received, directly or indirectly from one or more of the Sponsors, cash proceeds from the December 2006 CPEC Redemption.

28.     Defendant James Coulter is the Senior Vice President of TPG Capital. Mr. Coulter resides in San Francisco, California, and conducts business from locations including TPG Capital's offices located at 345 California Street, Suite 3300, San Francisco, California. Mr. Coulter travels to New York on various occasions including to conduct business for TPG Capital.  As of March 2014, Forbes reports that Mr. Coulter has a net worth of approximately $2.1 billion.

29.     As described further below, Mr. Coulter is an officer and director of defendants TPG Advisors IV, Inc. and T3 Advisors II, Inc., and he and Mr. Bonderman are the sole shareholders of TPG Advisors IV, Inc. and T3 Advisors II, Inc.  Upon information and belief, Mr. Coulter received, directly or indirectly from one or more of the Sponsors, cash proceeds from the December 2006 CPEC Redemption.

30.     Defendant TPG Capital, LLP, formerly known as Texas Pacific Group Europe, LLP ("TPG Europe"), is a limited liability partnership organized under the laws of the United Kingdom with its principal place of business located at Stirling Square, 5-7 Carlton Gardens, London, England.  Matthias Calice, a citizen of Austria, was at all relevant times a member of TPG Europe and, as described further below, served as a director of Hellas, TIM Hellas, and several of the Sponsors.  Philippe Costeletos, a citizen of Greece and the United States, was at all relevant times a member and co-head of TPG Europe, and, as described further below, served as a director of Hellas and TIM Hellas.  Upon information and belief, TPG Europe received, directly or indirectly from one or more of the Sponsors, cash proceeds from the December 2006 CPEC Redemption.

31.     The defendants named above in ¶¶ 22-30 collectively are referred to as the "TPG Capital Defendants."

**D.      The Apax Partners Defendants**

32.     Defendant Apax Partners LLP ("Apax Partners") is a limited liability partnership organized under the laws of England, with offices and a place of business located at 33 Jermyn Street, London, England.  Apax Partners is the holding partnership for the worldwide Apax partnership, which manages various private equity investment funds and operates from nine offices located in nine countries and four continents.  Those nine offices include one located in the United States at 601 Lexington Avenue, New York, New York, and occupied by affiliate and defendant Apax Partners, L.P., a Delaware limited partnership registered to do business in New York.

33.     An Executive Committee comprised of seven members is responsible for the day-to-day management of Apax Partners worldwide.  The current members of that Executive Committee are defendant and Chairman Martin Halusa, John Megrue, Michael Phillips, Andrew Sillitoe, Christian Stahl, and Mitch Truwit.  Messrs. Megrue and Truwit are located in New York.  Mr. Truwit is co-CEO for Apax Partners worldwide.  Mr. Megrue also sits on the Investment Committee for Apax Partners, which considers potential investments and makes investment recommendations.

34.     To date, Apax Partners has raised a total of at least $43.8 billion from investors around the world, including more than €4.3 billion for the Apax Europe VI fund alone.  At least 37% of the investors across the funds managed by Apax Partners are located within the United States.  The New York and U.S. investors in the Apax Europe VI fund include, for example, the Rockefeller Foundation, which is a private foundation with its principal place of business located

at 420 Fifth Avenue, New York, New York.  As of year-end 2007, the Rockefeller Foundation reported an investment in defendant Apax Europe VI-A, L.P. with a book value of $24.6 million.

35.     Apax Partners serves as lead investment advisor to most or all of the funds it manages.  In particular, Apax Partners advises defendant Apax Partners Europe Managers Ltd., which in turn is the investment manager for the Apax Europe VI fund.  Upon information and belief, Apax Partners received, directly or indirectly from one or more of the Sponsors, cash proceeds from the December 2006 CPEC Redemption.

36.     Defendant Martin Halusa is a member and the Chairman of Apax Partners, and was its Chief Executive Officer from 2003 through 2013.  Mr. Halusa is a citizen of Austria who resides in London, England, and conducts business from locations including Apax Partners's offices located at 33 Jermyn Street, London, England.  As described further below, Mr. Halusa is also a director for defendants Apax Partners Europe Managers Ltd. and Apax WW Nominees Ltd.  Upon information and belief, Mr. Halusa received, directly or indirectly from one or more of the Sponsors, cash proceeds from the December 2006 CPEC Redemption.

37.     Defendant Apax Partners, L.P. ("Apax Partners New York") is a Delaware limited partnership registered to do business in New York, with its principal place of business located at 601 Lexington Avenue, New York, New York.  Apax Partners New York is one of the entities comprising the worldwide Apax partnership and Mr. Mcgruc, who is the Chairman of Apax Partners New York, is a member of the Investment Committee for the worldwide Apax partnership.  Upon information and belief, Apax Partners New York received, directly or indirectly from one or more of the Sponsors, cash proceeds from the December 2006 CPEC Redemption.

38.     The defendants named above in ¶¶ 32-37 collectively are referred to as the "Apax Partners Defendants."

**E.      The Sponsors Including Defendant Apax WW Nominees Ltd.**

39.     Defendant Apax WW Nominees Ltd. ("Apax Nominees") is a limited company organized under the laws of England and Wales, with its registered office located at 33 Jermyn Street, London, England.  The eight-member board of directors of Apax Nominees is comprised entirely of members of Apax Partners, including defendant Martin Halusa and Giancarlo Aliberti.  Mr. Aliberti is a citizen of Italy and a member of Apax Partners who leads the Apax partnership's operations in Italy, Turkey, and Greece and, until on or about December 2012, had his office and place of business in Milan, Italy.  Apax Nominees is one of the eight so-called "Sponsors" that collectively held all of the CPECs and common stock issued by Hellas, and through which the Apax Partners Defendants and the TPG Capital Defendants, together with their respective affiliates the Apax Europe VI Defendants, the TPG Advisors IV Defendants, and the T3 Advisors II Defendants (as defined below), owned and controlled the Company and its affiliates and obtained proceeds from the December 2006 CPEC Redemption.  Apax Nominees redeemed 13,886 CPECs in the December 2006 CPEC Redemption from which it received a minimum of €493,925 in cash proceeds.

40.     Sponsor Troy L.P. Inc. was a company organized under the laws of Guernsey, with its registered office located at Royal Bank Place, 1 Glategny Esplanade, St. Peter Port, Guernsey, until its purported dissolution in 2010.  Giancarlo Aliberti and Matthias Calice were directors of Troy, L.P. Inc. at all relevant times prior to its dissolution.  Troy L.P. Inc. redeemed 11,248,464 CPECs in the December 2006 CPEC Redemption from which it received a minimum of €400,107,864 in cash proceeds.

13

41.     Sponsor TPG Troy LLC was a limited liability company organized under the laws of Delaware, with its principal place of business located at 301 Commerce Street, Suite 3300, Fort Worth, Texas, until its purported dissolution in 2007.  David Spuria, then General Counsel of defendant TPG Capital and General Counsel, Vice President, and Secretary of defendants TPG Advisors IV, Inc. and T3 Advisors II, Inc., executed the Certificate of Formation of TPG Troy LLC as of June 7, 2005.   TPG Troy LLC redeemed 9,922,256 CPECs in the December 2006 Transaction from which it received a minimum of €352,934,646 in cash proceeds.  Clive Bode executed the Certificate of Cancellation for TPG Troy LLC, dated as of December 17, 2007.  Mr. Bode has from no later than 2006 held the title of Vice President for defendant TPG Capital, and the titles of Vice President and Secretary for defendants TPG Advisors IV, Inc., and T3 Advisors II, Inc.

42.     Sponsor T3 Troy LLC was a limited liability company organized under the laws of Delaware with its principal place of business located at 301 Commerce Street, Suite 3300, Fort Worth, Texas, until its purported dissolution in 2007.  David Spuria executed the Certificate of Formation of TPG Troy LLC as of June 7, 2005.  T3 Troy LLC redeemed 1,340,094 CPECs in the December 2006 CPEC Redemption from which it received a minimum of €47,667,144 in cash proceeds.  Clive Bode executed the Certificate of Cancellation for TPG Troy LLC, dated as of December 17, 2007.

43.     Sponsor TCW HT Co-Invest I, L.P. was a limited partnership organized under the laws of the Cayman Islands, with its registered office located at the offices of M&C Corporate Services Limited, Ugland House, South Church Street, P.O. Box 309, George Town, Grand Cayman, Cayman Islands, until its purported dissolution in 2007.  Giancarlo Aliberti and Matthias Calice were directors of TCW HT Co-Invest I, L.P. at all relevant times prior to its

dissolution. TCW HT Co-Invest I, L.P. redeemed 663,104 CPECs in the December 2006 CPEC Redemption from which it received a minimum of €23,586,609 in cash proceeds.

44.     Sponsor TCW HT Co-Invest II, L.P. was a limited partnership organized under the laws of the Cayman Islands, with its registered office located at the offices of M&C Corporate Services Limited, Ugland House, South Church Street, P.O. Box 309, George Town, Grand Cayman, Cayman Islands, until its purported dissolution in 2007. Giancarlo Aliberti and Matthias Calice were directors of TCW HT Co-Invest II, L.P. at all relevant times prior to its dissolution. TCW HT Co-Invest II, L.P. redeemed 102,417 CPECs in the December 2006 CPEC Redemption from which it received a minimum of €3,642,973 in cash proceeds.

45.     Sponsor Hellas Telecommunications Co-Invest Ltd. was a limited company organized under the laws of the British Virgin Islands, with its registered office located at the offices of Maples Finance BVI Limited, P.O. Box 173, Kingston Chambers, Road Town, Road Town, Tortola, British Virgin Islands, until its purported dissolution in 2007. Giancarlo Aliberti and Matthias Calice were directors of Hellas Telecommunications Co-Invest Ltd. at all relevant times prior to its dissolution. Hellas Telecommunications Co-Invest Ltd. redeemed 2,117,766 CPECs in the December 2006 CPEC Redemption from which it received a minimum of €75,328,937 in cash proceeds.

46.     Sponsor Hellas Telecommunications Employees Ltd., formerly known as Troy Employees Ltd., was a limited company organized under the laws of the British Virgin Islands, with its registered office located at the offices of Maple Finance BVI Limited, Kingston Chambers, Sea Meadow House, P.O. Box 173, Road Town, Tortola, British Virgin Islands, until its purported dissolution in 2007. Giancarlo Aliberti and Matthias Calice were directors of Hellas Telecommunications Employees Ltd. at all relevant times prior to its dissolution. Hellas

Telecommunications Employees Ltd. redeemed 1,965,013 CPECs in the December 2006 CPEC Redemption from which it received a minimum of €69,895,512 in cash proceeds.

47.      In sum, on or about December 21, 2006, defendant Apax Nominees and the other Sponsors described above at ¶¶ 41-46 collectively redeemed 27,373,000 CPECs from Hellas in the December 2006 CPEC Redemption and received, in aggregate, at least €973,657,610 in cash proceeds.

**F.      The TPG Advisors IV Defendants**

48.      Defendant TPG Advisors IV, Inc. is a corporation organized under the laws of Delaware, with its principal place of business located at 301 Commerce Street, Suite 3300, Fort Worth, Texas.  Defendants David Bonderman and James Coulter, the co-founders of TPG Capital, are the sole shareholders of TPG Advisors IV, Inc.  Mr. Bonderman is the President and Chairman of the board of directors of TPG Advisors IV, Inc.  Mr. Coulter is the Senior Vice President and a member of the board of directors of TPG Advisors IV, Inc.  TPG Advisors IV, Inc. is the general partner of defendant TPG GenPar IV, L.P.  Upon information and belief, TPG Advisors IV, Inc. received, directly or indirectly from one or more of the Sponsors, cash proceeds from the December 2006 CPEC Redemption.

49.      Defendant TPG GenPar IV, L.P. is a limited partnership organized under the laws of Delaware, with its principal place of business located at 301 Commerce Street, Suite 3300, Fort Worth, Texas.  TPG GenPar IV, L.P. is the general partner of defendant TPG Partners IV, L.P., and was the manager of Sponsor TPG Troy LLC until its dissolution.  Upon information and belief, TPG GenPar IV, L.P. received, directly or indirectly from one or more of the Sponsors, cash proceeds from the December 2006 CPEC Redemption.

50.      Defendant TPG Partners IV, L.P. is a limited partnership organized under the laws of Delaware, with its principal place of business located at 301 Commerce Street, Suite

3300, Fort Worth, Texas.  Upon information and belief, TPG Partners IV, L.P. received, directly or indirectly from one or more of the Sponsors, cash proceeds from the December 2006 CPEC Redemption.

51.      The defendants named above in ¶¶ 48-50 collectively comprise the TPG Advisors IV fund and are referred to as the "TPG Advisors IV Defendants."

**G.      The T3 Advisors II Defendants**

52.      Defendant T3 Advisors II, Inc. is a corporation organized under the laws of Delaware, with its principal place of business located at 301 Commerce Street, Suite 3300, Fort Worth, Texas.  Defendants David Bonderman and James Coulter are the sole shareholders of T3 Advisors II, Inc.  Mr. Bonderman is the President and Chairman of the board of directors of T3 Advisors II, Inc.  Mr. Coulter is a Vice President and member of the board of directors of T3 Advisors II, Inc.  T3 Advisors II, Inc. is the general partner of defendant T3 GenPar II, L.P. Upon information and belief, T3 Advisors II, Inc. received, directly or indirectly from one or more of the Sponsors, cash proceeds from the December 2006 CPEC Redemption.

53.      Defendant T3 GenPar II, L.P. is a limited partnership organized under the laws of Delaware, with its principal place of business in Fort Worth, Texas.  T3 GenPar II, L.P. is the general partner of defendants T3 Partners II, L.P. and T3 Parallel II, L.P., and was the manager of Sponsor T3 Troy LLC until its dissolution.  Upon information and belief, T3 GenPar II, L.P. received, directly or indirectly from one or more of the Sponsors, cash proceeds from the December 2006 CPEC Redemption.

54.      Defendant T3 Partners II, L.P. is a limited partnership organized under the laws of Delaware, with its principal place of business in Fort Worth, Texas.  Upon information and belief, T3 Partners II, L.P. received, directly or indirectly from one or more of the Sponsors, cash proceeds from the December 2006 CPEC Redemption.

55.     Defendant T3 Parallel II, L.P. is a limited partnership organized under the laws of Delaware, with its principal place of business in Fort Worth, Texas.  Upon information and belief, T3 Parallel II, L.P. received, directly or indirectly from one or more of the Sponsors, cash proceeds from the December 2006 CPEC Redemption.

56.     The defendants named above in ¶¶ 52-55 collectively comprise the T3 Partners II and T3 Parallel II funds and are referred to as the "T3 Advisors II Defendants."  Upon information and belief, on or about December 21, 2006, the T3 Advisors II Defendants and the TPG Advisors IV Defendants received, directly or indirectly from one or more of the Sponsors, an aggregate of at least €400,601,789 in cash proceeds from the December 2006 CPEC Redemption.

## H.     The Apax Europe VI Defendants

57.     Defendant Apax Partners Europe Managers Ltd. ("APEM") is a limited company registered under the laws of England and Wales, with offices and a place of business located at 33 Jermyn Street, London, England.  The three-member board of directors of APEM is comprised entirely of members of Apax Partners, including the Chairman of Apax Partners, defendant Martin Halusa.  APEM serves as the investment manager for the Apax Europe VI fund and defendants Apax Europe VI-A, L.P. and Apax Europe VI-1, L.P.  APEM owns all of the share capital of defendant and Sponsor Apax Nominees.  Upon information and belief, APEM received, directly or indirectly from one or more of the Sponsors, cash proceeds from the December 2006 CPEC Redemption.

58.     Defendant Apax Europe VI GP Co. Ltd. is a limited company registered under the laws of Guernsey, with its registered office located at Royal Bank Place, 1 Glategny Esplanade, St. Peter Port, Guernsey.  Apax Europe VI GP Co. Ltd. is the general partner of defendant Apax Europe VI GP, L.P.  Upon information and belief, Apax Europe VI GP Co. Ltd. received,

directly or indirectly from one or more of the Sponsors, cash proceeds from the December 2006 CPEC Redemption.

59.     Defendant Apax Europe VI GP, L.P., also known as Apax Europe VI GP L.P. Inc., is a limited partnership registered under the laws of Guernsey, with its registered office located at Royal Bank Place, 1 Glategny Esplanade, St. Peter Port, Guernsey.  Apax Europe VI GP, L.P. is the general partner of defendants Apax Europe VI-A, L.P. and Apax Europe VI-1, L.P.  Upon information and belief, Apax Europe VI GP, L.P. received, directly or indirectly from one or more of the Sponsors, cash proceeds from the December 2006 CPEC Redemption.

60.     Defendant Apax Europe VI-A, L.P. is a limited partnership registered under the laws of England and Wales, with its registered office located at Royal Bank Place, 1 Glategny Esplanade, St. Peter Port, Guernsey.  Upon information and belief, Apax Europe VI-A, L.P. received, directly or indirectly from one or more of the Sponsors, cash proceeds from the December 2006 CPEC Redemption.

61.     Defendant Apax Europe VI-1, L.P. is a limited partnership registered under the laws of England and Wales, with its registered office located at Royal Bank Place, 1 Glategny Esplanade, St. Peter Port, Guernsey.  Upon information and belief, Apax Europe VI-1, L.P. received, directly or indirectly from one or more of the Sponsors, cash proceeds from the December 2006 CPEC Redemption.

62.     The defendants named above in ¶¶ 57-61 collectively comprise the Apax VI Europe fund and are referred to as the "Apax Europe VI Defendants."  Upon information and belief, and on or about December 21, 2006, the Apax Europe VI Defendants received, directly or indirectly from one or more of the Sponsors, a combined minimum of €400,601,789 in cash proceeds from the December 2006 CPEC Redemption.

I.      **The Investor Defendants**

63.     Many or all of the CPECs redeemed in the December 2006 Transaction by Sponsors Hellas Telecommunications Employees Ltd., Hellas Telecommunications Co-Invest Ltd., TCW HT Co-Invest I, L.P., and TCW HT Co-Invest II, L.P. were beneficially owned by certain officers and directors of TIM Hellas and Q-Telecom and other persons and entities who had invested in the CPECs, in or around 2005, in connection with TPG's and Apax's acquisition of TIM Hellas and Q-Telecom.  For example, the Company's financial statements for fiscal year 2006 state that the CPECs held by Sponsors Hellas Telecommunications Employees Ltd. and Hellas Telecommunications Co-Invest Ltd. were "beneficially owned" by "employees of TIM Hellas and Q-Telecom" and "other investors."  The defendants named below in ¶¶ 64-72 are referred to as the "Investor Defendants," and each of them received, on or about December 21, 2006, cash proceeds from the December 2006 CPEC Redemption from one or more of the foregoing Sponsors.

64.     Defendant TCW/Crescent Mezzanine Partners III Netherlands, L.P., also known as TCW/Crescent Mezzanine Partners Netherlands III, L.P. ("TCW Netherlands III"), is a limited partnership organized under the laws of Delaware with a registered office located at 2711 Centerville Road, Suite 400, Wilmington, Delaware.  Defendant TCW Netherlands III received a minimum of €987,921 in cash proceeds from the redemption of 27,774 CPECs held by Sponsor Hellas Telecommunications Co-Invest Ltd.

65.     Defendant TCW/Crescent Mezzanine Partners III, L.P., also known as TCW/Crescent Mezzanine Fund III, L.P. ("TCW Partners III"), is a limited partnership organized under the laws of Delaware, with an office and place of business located at 11100 Santa Monica Boulevard, Suite 2000, Los Angeles California.  Until the dissolution of Sponsor TCW HT Co-Invest I, L.P., TCW Partners III was its limited partner.  The general partner of

Sponsor TCW HT Co-Invest I, L.P. was TCW HT GenPar I Inc., a corporation organized under the laws of the Cayman Islands that was itself purportedly dissolved in 2007. Giancarlo Aliberti and Matthias Calice were directors of TCW HT GenPar I Inc. at all relevant times prior to its dissolution. Upon information and belief, defendant TCW Partners III received a minimum of €23,586,609 in cash proceeds from the redemption of 663,104 CPECs held by Sponsor TCW HT Co-Invest I, L.P.

66.    Defendant TCW/Crescent Mezzanine Trust III ("TCW Trust III") is a Delaware trust organized under the Delaware Business Trust Act with a business address at the offices of its trustee, Wilmington Trust Company, located at Rodney Square North, 1100 North Market Street, Wilmington, Delaware. Until the dissolution of Sponsor TCW HT Co-Invest II, L.P., TCW Trust III was its limited partner. The general partner of Sponsor TCW HT Co-Invest II, L.P. was TCW HT GenPar II Inc., a corporation organized under the laws of the Cayman Islands that was itself purportedly dissolved in 2007. Giancarlo Aliberti and Matthias Calice were directors of TCW HT GenPar II Inc. at all relevant times prior to its dissolution. Upon information and belief, defendant TCW Trust III received a minimum of €3,642,973 in cash proceeds from the redemption of 102,417 CPECs held by Sponsor TCW HT Co-Invest II, L.P.

67.    Defendant TCW/Crescent Mezzanine III, LLC ("TCW Mezzanine III") is a limited liability company organized under the laws of Delaware, with an office and place of business located at 11100 Santa Monica Boulevard, Suite 2000, Los Angeles, California. TCW Mezzanine III is the general partner of defendants TCW Netherlands III and TCW Partners III. TCW Mezzanine III is also the managing owner of defendant TCW Trust III. Upon information and belief, TCW Mezzanine III received, directly or indirectly from one or more of Sponsors

21

Hellas Telecommunications Co-Invest Ltd., TCW HT Co-Invest I, L.P., and TCW HT Co-Invest II, L.P., cash proceeds from the December 2006 CPEC Redemption.

68.    Defendant TCW Asset Management Company ("TCW Asset Management") is a corporation organized under the laws of California, with an office and place of business located at 865 South Figueroa Street, Suite 1800, Los Angeles, California.  TCW Asset Management is registered to do business in New York and also maintains an office and place of business in New York from which it provides investment advisory services, located at 1251 Avenue of the Americas, Suite 4700, New York, New York.  TCW Asset Management is the managing member of defendant TCW Mezzanine III.  TCW Asset Management is also the investment advisor to defendants TCW Netherlands III, TCW Partners III, and TCW Trust III.  Upon information and belief, TCW Asset Management received, directly or indirectly from one or more of Sponsors Hellas Telecommunications Co-Invest Ltd., TCW HT Co-Invest I, L.P., and TCW HT Co-Invest II, L.P., cash proceeds from the December 2006 CPEC Redemption.

69.    Defendant TCW Group Inc. ("TCW Group") is a corporation organized under the laws of Nevada, with an office and place of business located at 865 South Figueroa Street, Los Angeles, California. TCW Group is the sole owner of TCW Asset Management.   Upon information and belief, TCW Group received, directly or indirectly from one or more of Sponsors Hellas Telecommunications Co-Invest Ltd., TCW HT Co-Invest I, L.P., and TCW HT Co-Invest II, L.P., cash proceeds from the December 2006 CPEC Redemption.

70.    The Investor Defendants named above in ¶¶ 64-69 are referred to as the "TCW Defendants."   Upon information and belief, on or about December 21, 2006, the TCW Defendants received, directly or indirectly from Sponsors Hellas Telecommunications Co-Invest

Ltd., TCW HT Co-Invest I, L.P., and TCW HT Co-Invest II, L.P., an aggregate of at least €28,217,503 in cash proceeds from the December 2006 CPEC Redemption.

71.     Defendant Nikesh Arora resides in Atherton, California and is the Senior Vice President and Chief Business Officer of Google Inc., with an office and place of business located at 1600 Amphitheatre Parkway, Mountain View, California.  Mr. Arora became a member of the board of directors of TIM Hellas beginning in January 2006 and, upon information and belief, left that position in 2007.  Defendant Nikesh Arora received a minimum of €864,422 in cash proceeds from the redemption of 24,302 CPECs held by Sponsor Hellas Telecommunications Employees Ltd., plus a minimum of €246,963 in cash proceeds from the redemption of 6,943 CPECs held by Sponsor Hellas Telecommunications Co-Invest Ltd.

72.     Defendant Deutsche Bank AG ("Deutsche Bank") is a joint stock corporation incorporated with limited liability under the laws of Germany.  Deutsche Bank has offices in the United States and around the world, including a regional head office located at 60 Wall Street, New York, New York.  Deutsche Bank's New York office is registered with the New York State Department of Financial Services.  Deutsche Bank served as one of the underwriters and as security agent in connection with the sale and issuance of the Sub Notes.  Defendant Deutsche Bank received a minimum of €18,523,504 in cash proceeds from the redemption of 520,762 CPECs held by Sponsor Hellas Telecommunications Co-Invest Ltd.

**J.     The Additional Defendants**

73.     Does 1-25 (the "Additional Defendants") are persons and legal entities, including without limitation consultants, advisors, managers, shareholders, members, partners, subsidiaries, affiliates, and/or directors and officers of the TPG Capital Defendants, the Apax Partners Defendants, the Sponsors, the TPG Advisors IV Defendants, the T3 Advisors II Defendants, and/or the Apax Europe VI Defendants, who were recipients or beneficiaries of the

23

proceeds of the December 2006 CPEC Redemption and/or the Consulting Fees Transfer (defined below), or who otherwise participated directly or indirectly in the wrongful acts alleged in this Complaint. The identities of the Additional Defendants will be determined through discovery in this action.

## CLASS ALLEGATIONS

74.     Pursuant to Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, the claims set forth in the First Cause of Action (¶¶ 154-59) and Second Cause of Action (¶¶ 160-67) in this Complaint are brought against the defendants named above in ¶¶ 20-39 and 48-70 (collectively, the "Transferee Defendants"), individually and as representatives of a defendant class of similarly situated persons and legal entities (the "Transferee Class").

75.     The Transferee Class is comprised of all persons or legal entities who received, directly or indirectly, proceeds from the December 2006 CPEC Redemption, and who therefore were recipients of payments by the Company, excluding Giancarlo Aliberti, Maurizio Bottinelli, Matthias Calice, Philippe Costeletos, Guy Harles, Benoit Duvieusart, and defendants Deutsche Bank AG and Nikesh Arora.

76.     The Company's payments to the Transferee Class in connection with the redemption of approximately 27.3 million CPECs as part of the December 2006 CPEC Redemption totaled hundreds of millions of euro.

77.     Upon information and belief, the Transferee Class is comprised of at least 50 and potentially hundreds of members. Accordingly, the Transferee Class is so numerous that joinder of all of its members is impracticable.

78.    There are questions of law and fact common to the Transferee Class, which predominate over any issues that may involve individual members of the Transferee Class, including without limitation:

(a)    Whether, the Company, by and through its sole manager Hellas and the members of the Board of Managers of Hellas, made the December 2006 CPEC Redemption with the intent to hinder, delay and/or defraud the present and future creditors of the Company, and in particular the holders of the Sub Notes;

(b)    Whether the Company received less than fair consideration in exchange for the December 2006 CPEC Redemption;

(c)    Whether the Company was insolvent at the time of the December 2006 CPEC Redemption or became insolvent as a result of the December 2006 CPEC Redemption;

(d)    Whether, at the time of the December 2006 CPEC Redemption, the Company was engaged in business or a transaction, or was about to engage in business or a transaction, for which the Company was left with unreasonably small capital; and

(e)    Whether, at the time of the December 2006 CPEC Redemption, the Company intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

79.    Each of the Transferee Defendants received, directly or indirectly from the Sponsors, proceeds from the December 2006 CPEC Redemption, and therefore were recipients

25

of payments by the Company.  Any possible defenses of the Transferee Defendants are typical of those of the Transferee Class.

80.     If the Plaintiffs obtain a judgment in their favor on the claims set forth in the First Cause of Action and/or Second Cause of Action herein, the December 2006 CPEC Redemption will be avoided and the amounts paid will be recovered from the Transferee Class.  The Transferee Defendants collectively face a risk of loss of a minimum of €829,421,081 on those claims.  The Transferee Defendants will fairly and adequately protect the interests of the entire Transferee Class.

81.     The prosecution of separate actions against the individual members of the Transferee Class would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the Transferee Class that would establish incompatible standards of conduct, and/or (b) adjudications with respect to individual members of the Transferee Class that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

82.     A defendant class action is superior to other available methods for fairly and efficiently adjudicating this controversy because, *inter alia*, it avoids a multiplicity of individual adjudications with respect to the many dozens or hundreds of individual members of the Transferee Class, thereby conserving the resources of the Company's estate and of the Court.

## FACTUAL BACKGROUND

**A.    TPG and Apax Load the Company with Debt to Finance the**
**Leveraged Buyout of Greek Telecommunications Company TIM Hellas**

83.     By early 2005, TPG and Apax had set their sights on the acquisition of TIM Hellas Telecommunications, S.A. ("TIM Hellas"), a telecommunications company organized

under the laws of Greece with its principal place of business in Athens, Greece. TIM Hellas was the third-largest mobile telecommunications provider in Greece, and had a total customer base of approximately 2.3 million out of the 10.9 million customers in the Greek mobile phone market.

84.     For years, TIM Hellas had reported modest but steady revenue growth and a manageable debt burden. As of the year ended December 31, 2004, TIM Hellas reported an increase in total operating revenues year-over-year from €808.5 million to €829.1 million. Over the same period, TIM Hellas further reported a decline in its total debt from €242.0 million to €186.9 million. Its interest and other expenses for fiscal 2004 totaled €9.4 million.

85.     In March 2005, and in preparation for this acquisition, TPG and Apax organized a group of entities under the laws of Luxembourg, including: Hellas, Hellas I, Hellas Telecommunications (Luxembourg) III, S.à.r.l. ("Hellas III"), Hellas Telecommunications IV, S.à.r.l. ("Hellas IV"), Hellas Telecommunications (Luxembourg) V SCA ("Hellas V"), and Hellas Telecommunications Finance SCA ("Hellas Finance"). Each of the foregoing entities, and the Company, which was organized in 2003 and had remained dormant as a "shelf company" until the contemplated acquisition of TIM Hellas (collectively, the "Hellas Entities"), had its registered offices at 8-10, rue Mathias Hardt, Luxembourg. None of the Hellas Entities generated any operating revenues of its own, before or after the acquisition of TIM Hellas.

86.     Also in March 2005, TPG and Apax organized Troy GAC Telecommunications S.A. ("Troy GAC") under the laws of Greece, with a principal place of business located in Athens, Greece, to serve as the acquisition vehicle for TIM Hellas. Troy GAC and Hellas IV were subsidiaries of the Company, and Hellas III and Hellas V were subsidiaries of Troy GAC. The Company and Hellas Finance were wholly owned by Hellas I, which in turn was wholly owned by Hellas, which was wholly owned by the Sponsors.

27

87.    The relationship between and among the Sponsors, the Hellas Entities, and Troy

GAC as of the end of March 2005 is illustrated below:



88.    The acquisition of TIM Hellas was effected through a leveraged-buyout

transaction comprised of two stages. First, on June 15, 2005, Troy GAC acquired 80.87% of the

outstanding shares of TIM Hellas ("Stage One") for a purchase price of approximately €1.114

billion, plus €166.0 million to pay the existing debt of TIM Hellas and €69.9 million for

transaction costs. Stage One of the transaction was principally financed with €1.195 billion in

debt incurred by the Hellas Entities, including short-term loans of approximately €863 million

and €143 million borrowed by the Company's indirect subsidiaries Hellas V and Hellas III, respectively. Approximately €211 million, or less than 16% of the total financing required for Stage One, was contributed by TPG and Apax through the Sponsors.

89.    Moreover, €161 million (or more than 75%) of the €211 million contributed by TPG and Apax at Stage One was contributed in exchange for the issuance of debt instruments. Specifically, on June 15, 2005, the Company issued preferred equity certificates ("PECs") to Hellas I in an aggregate par value of €350 million, Hellas I issued PECs to Hellas with a par value of €161 million, and Hellas issued PECs to the Sponsors with a par value of €161 million. Unlike the CPECs issued by the Company (discussed below), the PECS entitled the holder to interest and were classified as long-term liabilities in the Company's financial statements.

90.    Second, on November 3, 2005, the remaining 19.13% of the outstanding shares of TIM Hellas was acquired by Troy GAC ("Stage Two") for an additional €263.5 million. Like Stage One, Stage Two of the transaction was principally financed by debt incurred by the Hellas Entities, including by the Company's indirect subsidiaries Hellas V and Hellas III. In Stage Two, the short-term loans borrowed during Stage One were repaid by the €925 million Senior Secured Floating Rate Notes due 2012, issued by Hellas V, the €355 million Senior Notes due 2013, issued by Hellas III, and approximately €116.5 million borrowed by Hellas Finance under a credit facility. Those notes were guaranteed by the Company and secured by liens on substantially all of the assets of the Company and certain of its subsidiaries. Approximately €39 million, or less than 15% of the total incremental financing required for Stage Two, was contributed by TPG and Apax through the Sponsors (in exchange for the issuance of PECs).

91.    The shares acquired from the minority shareholders in Stage Two of the transaction were cancelled and TIM Hellas merged into Troy GAC, with the surviving operating

entity a wholly owned subsidiary of the Company named TIM Hellas Telecommunications S.A., and which would later be renamed WIND Hellas Telecommunications SA (also referred to as "TIM Hellas").  In sum, TPG and Apax acquired TIM Hellas with a total contribution of €250 million (of which €200 million was exchanged for interest-bearing PECs), while the Company and its subsidiaries incurred approximately €1.28 billion in debt.

92.     Total third- and related-party debt of TIM Hellas increased from €186.9 million as of December 31, 2004, to €1.66 billion as of December 31, 2005, resulting in an increase from 1.3x to 17.6x in the ratio of debt to EBIT.  Thus, TIM Hellas's leverage had increased to more than seven times higher than the approximately 2.5x EBIT ratio of its competitors Vodafone Group PLC and Cosmote SA.

93.     Moreover, beginning with the acquisition, the Company and its subsidiaries paid millions of euro to TPG and Apax for alleged "consulting" or "business advisory" services.  As recorded in its financial statements, in fiscal year 2005 the Company was charged €15 million for certain "expenses incurred on behalf of Troy GAC by APAX and TPG for business advisory services."  Moreover, on or about July 15, 2005, TIM Hellas entered into a consulting services agreement whereby TIM Hellas agreed to pay in quarterly installments a "consulting fee" of €4 million per year.  Pursuant to that agreement, TIM Hellas made such "consulting fee" payments to the Company, the Company paid those amounts to Hellas I and, directly or indirectly, Hellas I paid those amounts to TPG and Apax.  From 2005 through 2007, the Company paid a minimum of €6.7 million in such "consulting fees" to Hellas I and, directly or indirectly, Hellas I then paid those same amounts to TPG and Apax.

94.     At all relevant times, TPG and Apax directed and controlled the actions of the Sponsors, the Hellas Entities, the Company, and the Company's subsidiaries.   Upon its

acquisition by TPG and Apax in 2005, operating company TIM Hellas was subject to a shareholders agreement pursuant to which TPG and Apax were authorized to nominate, through the Sponsors, nine out of the ten members of its board of directors. At all times thereafter until their sale of the Company and its subsidiaries in February 2007, TPG and Apax exercised that authority to install certain key personnel on the board of directors of TIM Hellas. As of the year-ended December 31, 2005, for example, the members of the TIM Hellas board included Philippe Costeletos, Matthias Calice, and Vincenzo Morelli from TPG, and Giancarlo Aliberti, Maurizio Bottinelli, and Salim Nathoo from Apax. As detailed above, many of those same TPG and Apax personnel (and others) held overlapping positions of authority on the Board of Managers of Hellas (the sole manager of the Company) and in the management of the Sponsors, the TPG Advisors IV Defendants, the T3 Advisors II Defendants, the Apax Europe VI Defendants, the TPG Capital Defendants, and the Apax Partners Defendants.

**B.      The Company Issues 490,000 CPECs with a Combined Par Value
        of €49 Million in Connection With the Acquisition of TIM Hellas**

95.      The €250 million that TPG and Apax contributed to the TIM Hellas acquisition was transferred to Hellas, the direct or indirect parent of each of the Hellas Entities and Troy GAC, through the Sponsors. Upon information and belief, the Sponsors had received that €250 million, directly or indirectly, from the TPG Advisors IV Defendants, the T3 Advisors II Defendants, and the Apax Europe VI Defendants.

96.      On or about June 15, 2005, upon the transfer of €49 million from the Sponsors to Hellas (out of the €250 million total contribution), Hellas issued 490,000 CPECs to the Sponsors. That €49 million was immediately further transferred from Hellas to Hellas I, and from Hellas I to the Company. At the same time, Hellas I issued 490,000 CPECs to Hellas and the Company

issued 490,000 CPECs to Hellas I.  These CPECs had an initial par value of €100 each, for an aggregate par value of €49 million issued by each of Hellas, Hellas I, and the Company.

97.     By their terms, the CPECs issued by the Company were subordinate to all other present or future obligations of the Company, accrued no interest, and would mature, at par, 30 years after their issue date.  At the time of maturity, the Company had the right to convert the CPECs into ordinary shares in the Company, subject to consent by the holder of the CPECs (*i.e.*, Hellas I).  If not converted into shares, the CPECs would, at maturity, be redeemed at par value, but only if the Company would have sufficient funds available to pay its obligations to all of its creditors after such redemption.  The holder of the CPECs had no right, at any time, to demand the conversion or redemption of the CPECs.

98.     In certain limited circumstances, the Company had the option, but never the obligation, to redeem some or all of the CPECs prior to maturity (an "Optional Redemption").  The terms of the CPECs provided that such an Optional Redemption could occur if and only if:

> [A]fter payment of or provision for other obligations of the Company having priority to the CPECs, the Company disposes of funds resulting from (i) payments made by the Company's subsidiaries to the Company or (ii) sales of shares of Subsidiaries to an unaffiliated party (iii) and the Company will not be insolvent after payment of aggregate Optional redemption Price of the CPECs.

99.     For the avoidance of any doubt, the terms of the CPECs further provided that:

> The Optional Redemption can only be exercised by the Company, and not by the Holders, and under the condition that the Company will not be insolvent after payment of the aggregate Optional Redemption Price of the CPECs to be redeemed in cash or in kind.

100.    In the event that the preconditions for an Optional Redemption occurred, the terms of the CPECs also mandated the method for determination of the price at which the CPECs

could then be redeemed (the "Optional Redemption Price").   Specifically, the Optional

Redemption Price was defined as:

> [T]he greater of (i) the Par Value of a CPEC and (ii) the market
> value, on a fully diluted basis (i.e., number of outstanding Ordinary
> Shares and outstanding CPECs), of the Conversion Shares into
> which the CPEC would have been convertible or converted
> pursuant to Clause 4, reduced by 0.5%.

101.   Moreover, the terms of the CPECs mandated that any determination by the

Company to set the Optional Redemption Price at a "market value" greater than par had to be

made "by the Board of Managers on the basis of the equity value of the Company and its

subsidiaries on an arm's length basis."

102.   Accordingly, and fittingly, the Company classified the CPECs as equity.   For

example, the Company's fiscal 2006 financial statements state that it "has concluded that [the

CPECs] should be classified as equity," explaining that "CPECs are convertible into a fixed

number of the Company's shares at the option of the Company.   In the event of redemption of

CPECs above par value, the excess is charged directly to equity as dividends."

**C.      TPG and Apax Use the Company to Acquire Greek Telecommunications
         Company Q-Telecom, and the Company Incurs Even Greater Debt**

103.   Meanwhile, by the middle of 2005, TPG and Apax had decided to use the Hellas

Entities to acquire Q-Telecom, a business unit of Info-Quest S.A. that operated the fourth-largest

mobile network in Greece.   The stock purchase agreement for that acquisition was entered into as

of October 27, 2005.   The Q-Telecom acquisition closed on January 31, 2006, for a purchase

price of approximately €355 million (including €25 million to pay the existing debt of

Q-Telecom), plus €12.1 million in fees in connection with the transaction and its financing.   On

June 1, 2006, Q-Telecom merged into Helen GAC Telecommunications S.A., a subsidiary of

TIM Hellas formed to serve as the Greek acquisition vehicle, and the entity surviving the merger changed its named to Q Telecommunications S.A. ("Q-Telecom").

104.    The Q-Telecom acquisition was principally financed with €200 million in debt incurred by the Company's subsidiary Hellas V, together with €27.1 million in cash contributed by one or more of the Company's subsidiaries.  Specifically, Hellas V issued an additional €200 million in Senior Secured Floating Rate Notes due 2012 as of February 1, 2006, the proceeds of which were used to repay €200 million in short-term borrowings during the acquisition. Approximately €140 million, or less than 42% of the total financing required for the Q-Telecom acquisition, was contributed by TPG and Apax through the Sponsors.  Upon information and belief, the Sponsors had received that €140 million, directly or indirectly, from the TPG Advisors IV Defendants, the T3 Advisors II Defendants, and the Apax Europe VI Defendants.

105.    On or about January 31, 2006, upon the transfer of €28.3 million from the Sponsors to Hellas (out of the €140 million total contribution, of which €111 million was exchanged for PECs), Hellas issued an additional 282,681 CPECs to the Sponsors.  As that €28.3 million was immediately further transferred from Hellas to Hellas I, and from Hellas I to the Company, Hellas I issued 282,681 CPECs to Hellas and the Company issued 282,681 CPECs to Hellas I.  These CPECs, too, had an initial par value of €100 each, bringing the aggregate par value of all CPECs issued to date by each of Hellas, Hellas I, and the Company to €77,268,100. The CPECs issued on or about January 31, 2006 were subject to the terms described above in ¶¶ 96-101.

106.    By January 31, 2006, therefore, TPG and Apax had acquired both TIM Hellas and Q-Telecom with a total contribution of only €390 million (€311.2 million of which was exchanged for interest-bearing PECs), while the Company and its subsidiaries had incurred

approximately €1.48 billion in debt in conjunction with the acquisitions.  TPG and Apax would not wait long before recouping their investment (several times over) and burdening the Company with unsustainable debt in the process.

**D.**     **TPG and Apax Extract Nearly All of the Funds they Contributed to the TIM Hellas and Q-Telecom Acquisitions, Leaving Behind Still More Debt**

107.    By early 2006, having only recently completed the acquisition of TIM Hellas and Q-Telecom by the Company, TPG and Apax determined to withdraw the funds they had contributed to those acquisitions, before then pursuing a sale of their stake in the Company.  As an initial step, on or about April 12, 2006, Hellas Finance issued €500 million in Floating Rate Senior PIK Notes due 2014 (the "Original PIK Notes"), guaranteed by its parent Hellas I.  Approximately €376.6 million of the €500 million borrowed by Hellas Finance, or more than 75%, was transferred to the Sponsors on or about that same date.  Upon information and belief, the Sponsors then transferred that €376.6 million, directly or indirectly, to the TPG Capital Defendants, the Apax Partners Defendants, the TPG Advisors IV Defendants, the T3 Advisors II Defendants, and the Apax Europe VI Defendants.

108.    Of the approximately €376.6 million transferred to the Sponsors on or about April 12, 2006, €43.5 million passed through the Company to redeem CPECs held at par by its parent Hellas I.  In turn, Hellas I paid €43.5 million to redeem CPECs held at par by its parent Hellas, and Hellas paid €43.5 million to redeem CPECs held at par by the Sponsors.  This Optional CPEC Redemption violated the terms of the CPECs, which prohibited such a redemption prior to maturity – even at par – except to transfer funds received from a subsidiary of the Company or from a sale of such a subsidiary to a third party (and even then only if payment or provision had been made for all other obligations of the Company).  This would not be the last time the terms of the CPECs would be ignored.

109.    On or about the same date, April 12, 2006, all outstanding CPECs underwent a 1-100 split by agreement of the Sponsors and Hellas.  As a result of that split, the par value of each individual CPEC was decreased from €100 to €1, but the aggregate par value of all outstanding CPECs remained unchanged.  Following the 1-100 split of the CPECs and the Company's payment of €43.5 million to redeem CPECs held at par by Hellas I, there remained outstanding 33,808,736 CPECs issued by the Company, with a total par value of €33,808,736.

110.    Thus, by April 2006, TPG and Apax had already extracted over 90%, or all but €35 million, of their €390 million total contribution for the acquisitions of both TIM Hellas and Q-Telecom.  The Company and its subsidiaries, by contrast, were saddled with approximately €1.98 billion in third- and related-party debt as of the end of the second quarter of 2006. Nonetheless, the appetites of TPG and Apax for additional returns on their equity investments remained unsatisfied.

**E.    Dissatisfied with the Results of an Auction to Sell the Company, TPG and Apax Hatch a Scheme to Pay Themselves a Windfall from Borrowed Funds**

111.    No later than June 2006, a year after the acquisition of a controlling interest in TIM Hellas, TPG and Apax put in motion plans to dispose of the Company's subsidiaries in a sale to a third party.  The Company retained KPMG LLP ("KPMG") to assist in marketing its subsidiaries to potential purchasers in an engagement code-named "Project Ulysses."  KPMG commenced work on Project Ulysses by June 26, 2006, and completed its fieldwork by October 11, 2006.  As set forth in the corresponding engagement letter, which was executed on behalf of the Company by Matthias Calice as of October 9, 2006, the purpose of KPMG's work was to "prepare a report in connection with the potential disposal of TIM Hellas and subsidiaries, i.e. Q-Telecom, Hellas III, V, and VI," for "consideration by prospective purchasers."  KPMG

issued that report, dated October 19, 2006, and an addendum, dated November 15, 2006 (together, the "KPMG Report").

112.    During or before fall 2006, TPG and Apax engaged Morgan Stanley and Lehman Brothers to act as financial advisors in connection with the auction of the Company's subsidiaries.  Interest in the Company's then heavily indebted subsidiaries proved tepid, with only a few potential purchasers expressing sufficient interest even to receive the KPMG Report, and none willing to pay the price demanded by TPG and Apax.  Even the KPMG Report acknowledged that the Company's subsidiaries carried a "high level of debt" that had "increased between December 2005 and June 2006."  Over that time period, the aggregate third- and related-party debt of the Company and its subsidiaries had risen from €1.66 billion as of December 31, 2005, to €1.98 billion as of June 30, 2006.

113.    The sale price TPG and Apax demanded from potential bidders was, upon information and belief, at least €3.5 billion, more than double the total consideration paid to acquire TIM Hellas and Q-Telecom.  On September 25, 2006, the Times (U.K.) reported that "sources close to the deal said that many potential buyers were likely to balk at the mooted Euro 3.5 billion to Euro 4 billion price tag," with one such source describing the sale as an "opportunistic flip attempt."

114.    In fact, potential buyers did balk.  First-round bids were due by October 9, 2006. The handful of bidders that submitted preliminary expressions of interest to acquire the Company's subsidiaries TIM Hellas and Q-Telecom included Emirates Telecommunications Corp., Providence Equity Partners Inc., and Orascom Telecom Holding SAE.  By November 16, 2006, Emirates Telecommunications Corp. and Providence Equity Partners Inc. were the only remaining bidders.  By December 4, 2006, Emirates Telecommunications Corp. withdrew its bid.

37

By December 8, 2006, TPG and Apax abandoned the auction after bidders failed to meet their price.

115.    After the market proved unable to deliver the outsized returns on investment desired by TPG and Apax, they instead took steps to extract those returns from the Company under the guise of a purported "refinancing" of its debt.

**F.      TPG and Apax Use the Company to Borrow More than €1.4 Billion, Proceeds of which are Siphoned Out of the Company by an Improper Redemption of CPECs**

116.    In December 2006, TPG and Apax orchestrated an integrated scheme, executed in several near-simultaneous steps, through which the Company and its subsidiaries borrowed vast additional sums, and almost €1 billion was transferred out of the Company without consideration for the benefit of TPG and Apax and to the detriment of the Company's creditors (the "December 2006 Transaction").

117.    The principal steps of the December 2006 Transaction, which all were completed on or about December 21, 2006, included the following:  (1) the Company's subsidiary Hellas V issued €97.25 million of Senior Secured Floating Rate notes due 2012 (the "Senior Notes"), the proceeds of which were transferred to the Company together with approximately €102 million in cash from the Company's subsidiary TIM Hellas; (2) Hellas Finance issued €200 million of Floating Rate Senior PIK Notes due 2015 (the "New PIK Notes"), the proceeds of which were loaned to the Company by Hellas I; (3) the Company issued €960 million and $275 million of Floating Rate Subordinated Notes due 2015 (*i.e.*, the Sub Notes); (4) the Company transferred approximately €1.57 billion to its parent Hellas I, of which at least €978,659,712 was paid to Hellas I in redemption of outstanding CPECs issued by the Company, then paid to Hellas to redeem CPECs issued by Hellas I (less approximately €5 million in advisor fees), and then paid to the Sponsors to redeem CPECs issued by Hellas; and (5) the remainder of the approximately

€1.57 billion transferred by the Company to Hellas I was used to pay the €500 million Original

PIK Notes and interest, plus the approximately €48.8 million in additional transaction costs

associated with the December 2006 Transaction.

118.    The flow of funds resulting from those principal steps of the December 2006

Transaction is illustrated below:



119.    The €960 million and $275 million of Sub Notes were issued by the Company

pursuant to a confidential offering memorandum dated December 18, 2006 (the "Offering

Memorandum"). As set forth in the Offering Memorandum, interest on the Sub Notes was due four times per year, on January 15, April 15, July 15, and October 15, until maturity on January 15, 2015. The variable interest rate on the euro-denominated and dollar-denominated Sub Notes was three-month EURIBOR plus 6.0% and three-month LIBOR plus 5.75%, respectively.

120.    The Sub Notes were marketed and sold to investors located in jurisdictions including New York and elsewhere in the United States. The Offering Memorandum provided that the Sub Notes could be offered only to investors who either were Qualified Institutional Buyers ("QIBS") located in the United States, within the meaning of Rule 144A of the U.S. Securities Act of 1933 (the "Securities Act"), or Non-U.S. Persons within the meaning of Regulation S under the Securities Act. Latham & Watkins LLP was retained to provide the underwriters of the Sub Notes with a blue sky memorandum, dated December 18, 2006, which advised that the Sub Notes could be offered and sold in each of the 50 states, plus the District of Columbia, Guam, and Puerto Rico. That memorandum also advised that "Further State Notices" had been filed with the New York Department of State, as a result of which offers and sales of the Sub Notes could be "made to any QIB" located in New York. Upon information and belief, approximately 30% of the investors who purchased the Sub Notes were located in New York.

121.    The Offering Memorandum provided that the Sub Notes and the indenture for the Sub Notes would be governed by New York law, and that the Company would consent to jurisdiction in any actions relating to the Sub Notes or the indenture brought in any U.S. federal or state court located in Manhattan, New York, New York. The trustee, registrar, and paying agent for the Sub Notes was the Bank of New York, with offices located at 101 Barclay Street, New York, New York.

122.    The Sub Notes were fully subscribed by December 21, 2006.  That same day, the Company paid €978,659,712 in proceeds to Hellas I to redeem 27.3 million CPECs at €35.82 per CPEC, Hellas I then paid €973,657,610 to Hellas (after payment of approximately €5 million in advisor fees) to redeem 27.4 million CPECs at €35.57 per CPEC, and Hellas then paid €973,657,610 to the Sponsors to redeem 27.4 million CPECs at €35.57 per CPEC (*i.e.*, collectively the December 2006 CPEC Redemption).  All of the redeemed CPECs had a par value of €1 per CPEC but were redeemed at more than 35 times that amount.

123.    Upon information and belief, cash proceeds from the December 2006 CPEC Redemption were transferred, directly or indirectly, on or about December 21, 2006, from the Sponsors to TPG and Apax, the Investor Defendants, and the Transferee Class.  Having served their tactical purposes, seven out of the eight Sponsors were subsequently dissolved, including six within a matter of months.

124.    The December 2006 CPEC Redemption was carried out hastily and in utter disregard of fiduciary obligations to the Company and its creditors, the solvency of the Company, and the terms of the CPECs.  The Company redeemed 27.3 million CPECs at €35.82 per CPEC pursuant to a Redemption Agreement of EUR 978,659,712 CPECs, which was entered into by the Company and Hellas I as of December 21, 2006 (the "Hellas I Redemption Agreement").  Giancarlo Aliberti and Matthias Calice executed that agreement on behalf of both parties.  The Hellas I Redemption Agreement recited that the Optional Redemption Price of €35.82 per CPEC allegedly had been "determined by the Board of Managers on the basis of the equity value of the Company and its Subsidiaries by resolutions adopted on December 18, 2006."

125.    A separate Redemption Agreement of EUR 973,657,610 CPECs, also dated as of December 21, 2006 (the "Sponsor Redemption Agreement"), was entered into by Hellas and

each of the Sponsors.  Giancarlo Aliberti and Matthias Calice executed the Sponsor Redemption Agreement on behalf of Hellas and each of the eight Sponsors.  The Sponsor Redemption Agreement likewise recited that the Optional Redemption Price of €35.57 per CPEC allegedly had been "determined by the Board of Managers on the basis of the equity value of the Company and its Subsidiaries by resolutions adopted on December 18, 2006."

126.    The resolutions adopted by Hellas as of December 18, 2006, as sole manager and general partner of the Company (the "December 18 Resolutions"), were executed by the members of the Board of Managers of Hellas, including Maurizio Bottinelli, Giancarlo Aliberti, Matthias Calice, Philippe Costeletos, Guy Harles, and Benoit Duvieusart (all or nearly all of whom were affiliated with TPG or Apax).  The December 18 Resolutions recited, among other things, that "the Company intends to participate in a new refinancing of the existing indebtedness . . . the proceed[s] of which shall be used for the repayment of existing deeply subordinated shareholder loans."  The December 18 Resolutions then perfunctorily asserted that "[t]he Managers hereby resolve to set the Optional Redemption Price . . . based on the equity value of the Company and its Subsidiaries on an arm's length basis."

127.    The record reflects no such arm's-length determination of the Optional Redemption Price on the basis of the equity value of the Company and its subsidiaries.  The December 18 Resolutions do not memorialize any meeting of the Board of Managers of Hellas at which the Optional Redemption Price was determined and, upon information and belief, no such meeting was ever held.  The December 18 Resolutions do not assert that the Company retained any financial advisors to value the equity of the Company or opine as to the Company's solvency for the purpose of an arm's-length determination of the Optional Redemption Price and, upon information and belief, no such valuation or solvency opinion was ever procured.

128.   To the contrary, while a December 11, 2006 draft of the "Capitalization" section of the Offering Memorandum represented that "the equity interests in Hellas II will be revalued to their fair market value" upon "the receipt of an independent appraisal . . . prior to the issuance of the [Sub] Notes," that provision was stricken from the final Offering Memorandum and, upon information and belief, no such "independent appraisal" for the purpose of the determination of the Optional Redemption Price was ever obtained.   Upon information and belief, the Optional Redemption Price for the December 2006 CPEC Redemption was fixed by TPG and Apax not at arm's length on the basis of the equity value of the Company, but contrived to facilitate a distribution to the Sponsors (and ultimately to TPG and Apax) in the desired amount of €973,657,610.

129.   Although the Company's auditors at Ernst & Young issued an opinion as to whether the Company's assets and liabilities were at least equal to shareholders' equity, dated December 18, 2006, that opinion did not constitute (and, upon information and belief, was not intended to constitute) a fair market valuation of the equity of the Company for the purpose of an arm's-length determination of the Optional Redemption Price.   Instead, Ernst & Young issued that opinion in connection with the transformation of the legal form of the Company under Luxembourg law from a S.à.r.l. (*société à responsabilité limitée*), a private limited liability company, to an SCA (*société en commandite par actions*), a partnership limited by shares.   In any event, Ernst & Young's opinion noted that the net book value of the Company according to its financial statements was approximately €2.88 million as of October 31, 2006.   Such a valuation could never have supported (and if anything precluded) an arm's-length redemption of CPECs at a €951.3 million premium over par.

130.    Fixing the Optional Redemption Price for the December 2006 CPEC Redemption at more than 35 times par violated the plain terms of the CPECs, which mandated that the Optional Redemption Price could not exceed the €1 par value absent an arm's-length determination of a market value greater than par on the basis of the equity value of the Company. Moreover, by the terms of the CPECs, there could be no Optional Redemption (*i.e.*, a redemption prior to maturity) at *any* price except to dispose of funds received from a subsidiary of the Company or from a sale of such a subsidiary to a third party, and even then only if the Company would be solvent after that Optional Redemption and payment or provision had been made for all other obligations of the Company.

131.    None of those conditions was satisfied in connection with the December 2006 CPEC Redemption.  At least 93% of the €1.57 billion disposed of by the Company in the December 2006 Transaction was the proceeds of the Sub Notes and other loans, and not from the operations of the Company's subsidiaries (or the sale of any such subsidiary).

132.    The December 2006 CPEC Redemption left the Company insolvent and made no provision for the payment of its debts to the holders of the Sub Notes or other creditors.  The Company, by and through its sole manager Hellas and the Board of Managers of Hellas, knew or should have known that the Company's payment of €978,659,712 to redeem CPECs (let alone the remainder of the total of €1.57 billion that the Company transferred to its parent Hellas I in the December 2006 Transaction) would leave the Company insolvent, with unreasonably small capital to run its business, and unable to pay its debts as they became due.

133.    By early 2007, the Company issued consolidated financial statements for the year ended December 31, 2006, which starkly illustrated the Company's dire financial condition in the wake of the December 2006 CPEC Redemption.  Those financial statements showed that the

Company had recorded a negative equity balance (*i.e.*, insolvency on a net book value basis) in excess of €1 billion.   Further, as of December 31, 2006, goodwill from acquisitions and intangible assets comprised €1.59 billion, or over 60%, of €2.52 billion in total assets recorded by the Company.  The Company's consolidated third- and related-party debt had reached nearly €2.94 billion, with the Sub Notes alone accounting for €960 million and $275 million of that debt.  Moreover, the Company's net losses had worsened year-over-year from €37.2 million to €55.5 million, which was attributed in part to "the significant increase in interest expense associated with the financing of the TIM Hellas Acquisition and the Q-Telecom Acquisition."

134.   In addition to the compelling evidence of insolvency provided by the Company's own financial statements, other contemporaneous valuation indicators support the same conclusion.  The analysis prepared by TIM Hellas's financial advisors at Morgan Stanley in August 2005 in connection with Stage Two of the TPG and Apax acquisition indicated that the price offered by TPG and Apax implied a multiple of 6.8x earnings before interest, taxes, depreciation, and amortization ("EBITDA").  This transaction multiple compares to the mean EBITDA multiple of 6.7x for the comparable companies identified therein by Morgan Stanley, which remained relatively unchanged through year-end 2006.  Applying the 6.8x EBITDA multiple from the TPG and Apax acquisition to the Company's 2006 EBITDA of €380.5 million results in an enterprise value of €2.6 billion as of December 31, 2006, which is far less than the Company's liabilities and demonstrative of insolvency.

135.   The contemporaneous internal budget adopted by the Company at the beginning of 2007 acknowledged that these dire conditions were unlikely to improve.  As of January 30, 2007, the Board of Managers of Hellas adopted resolutions approving the Company's consolidated budget for the fiscal year ending December 31, 2007.  That budget projected a loss

for the year of at least €50.9 million. Such losses were projected despite anticipated operating income of more than €244 million because that income was expected to be wiped out by the Company's debt-service obligations. In the end, management's budget forecast would prove to be overly optimistic: The Company's financial statements for the year ended December 31, 2007 recorded a loss of more than €71.2 million. This loss deepened the Company's accumulated deficit to €1.1 billion.

136.   The strain was also evident in the Company's financial ratios. Following the December 2006 Transaction, the Company's debt ballooned to more than 16.1x EBIT and 7.7x EBITDA, exceeding industry norms. The Company's EBIT was only 1.3x its cash interest charges, as compared to a 9.6x industry average based on certain comparable companies. Debt to Tangible Assets increased to 3.2x at December 31, 2006 from 2.3x at June 30, 2006, while the industry average was 0.7x at the end of the year. In fact, total debt as of December 31, 2006 was almost three times larger than total revenue for that year.

137.   In the Company's budget for the year ending December 31, 2007, interest payments, cash taxes and capital expenditures were forecast to absorb 87% of EBITDA, leaving only €59.6 million in net cash flow for future debt repayment. At this rate of accumulation, the Company's cash flow would be grossly insufficient for debt amortization, and the Company would instead be reliant on uncertain prospects for refinancing the €1.2 billion, €355 million, and €1.2 billion debt maturing in 2012, 2013, and 2015, respectively.

138.   The Company's net cash flow before debt repayment relative to total debt, as of year-end 2004 to year-end 2007, is illustrated below:



Notes:
1. 2004 Actual reflects actual balances of TIM Hellas Telecommunications S.A.
2. 2005 Actual reflects balances of Hellas Telecommunications II S.àr.l. The 2005 net cash flow before debt repayment includes certain pro forma adjustments assuming that the TIM Hellas acquisition had occurred on January 1, 2005.
3. 2006 Actual and 2007 Budget reflect actual balances and budgets of Hellas Telecommunications II SCA, respectively.  Total debt for 2007 assumes the actual 2006 total debt.

139.   In sum, the December 2006 Transaction left the Company over-leveraged with no reasonable prospect of amortizing its debt.  The Company's expected cash flow from operations was almost fully consumed by hundreds of millions of dollars in interest costs and capital expenditure needs, leaving insufficient resources for future debt amortization or reserves.  Further, the Company was left with wholly insufficient resources to deal with reasonably foreseeable contingencies such as increasing competition, political instability, a potential economic downturn, a tightening of the capital markets, or the prospect that it would fall short of its business plan.

140.   The statement of "[r]isks related to our debt" in the Company's fiscal 2006 financial statements grossly understated the obvious:   "We have a substantial amount of outstanding debt with significant debt service requirements."  Even according to the Company,

this "significant leverage" could, among other potential consequences, increase "our vulnerability to economic downturns in our industry," "expos[e] us to interest rate increases," and "mak[e] it more difficult for us to satisfy our obligations with respect to the [Sub Notes] and our other debt and liabilities." The Company further recognized that "if there is a default, the value of the security may not be sufficient to repay the . . . holders of the Subordinated Notes." That injury to creditors, perpetrated through TPG's and Apax's scheme, is precisely what would occur.

141. Stunningly, TPG and Apax continued to collect "consulting fees" from the Company and its subsidiaries even after carrying out the December 2006 Transaction, to the detriment of the Company and its creditors. From on or about December 21, 2006, through the sale to Weather Investments in 2007, the Company paid a minimum of €1.22 million in additional "consulting fees" to Hellas I and, directly or indirectly, Hellas I then paid approximately those same amounts to TPG and Apax (the "Consulting Fees Transfer"). The Consulting Fee Transfer extracted yet more assets from the insolvent Company without fair or adequate consideration.

G. **TPG and Apax Wash Their Hands of the Company, which Staggers Toward Bankruptcy Under its Crushing Debt Burden**

142. In February 2007, less than two months after extracting nearly €1 billion from the Company in the December 2006 Transaction, TPG and Apax agreed to sell the Company and its subsidiaries to Weather Investments S.p.A., later renamed WIND Telecom S.p.A. ("Weather Investments"). Weather Investments is a stock corporation organized under the laws of Italy, with registered offices located in Rome, Italy. At that time, Weather Investments was owned and controlled by its 97% beneficial owners Naguib Sawiris, an Egyptian billionaire, and other members of the Sawiris family. A February 7, 2007 press release announcing the sale asserted

that the acquisition by Weather Investments was "consistent with the strategy of the group" to expand "Weather's European footprint beyond Italy," and that Weather Investments "holds a 51% stake in Tellas S.A., an alternative fixed line provider in Greece." Mr. Sawiris stated that Weather Investments anticipated "building on group wide synergies at all levels."

143. As reported by the Associated Press on February 7, 2007, Mr. Sawiris further stated in an interview that "[t]here is synergy in terms of combining our international traffic between Wind, Orascom Telecom and TIM Hellas as we are building an international cable between Italy and Greece and then between Greece and Egypt." Those "synergies" were specific to Weather Investment and, upon information and belief, not representative of benefits for which other potential buyers would be willing to pay.

144. Weather Investments entered into a Securities Purchase Agreement, dated February 6, 2007 (the "SPA"), to acquire 100% of the equity of Hellas, the indirect parent of the Company and its subsidiaries, from the Sponsors for a purchase price of €500 million. Of that consideration, €6,435,736 was allocated toward the purchase, at their par value of €1 per CPEC, of 6,435,736 of the remaining CPECs previously issued by Hellas to the Sponsors. That purchase of CPECs at par even further calls into question the December 2006 CPEC Redemption at more than 35 times par less than two months earlier. None of the €500 million purchase price was contributed to the Company or its subsidiaries, and there was no provision for the payment of any of their existing debt. The acquisition of the Company by Weather Investments was financed by Citigroup, Banca IMI, and Deutsche Bank (or an affiliate thereof).

145. Pursuant to Section 3.12 of the SPA, the Sponsors represented and warranted that they were "Affiliates" of defendants TPG GenPar IV, L.P., T3 GenPar II, L.P., and Apax Europe VI GP Co. Ltd. Therefore, under the SPA's definition of "Affiliate," each of those defendants

"directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with" the Sponsors. Defendants TPG Partners IV, L.P., T3 Partners II, L.P., T3 Parallel II, L.P., and Apax Europe, VI-A, L.P. each also entered into the SPA and agreed to be bound by certain but not all of the SPA's provisions, including agreeing to indemnify Weather Investments in certain circumstances.

146. The sale to Weather Investments closed on April 20, 2007. From April 2006 through that closing, TPG and Apax had extracted a total of approximately €1.85 billion from the Hellas Entities, which represented an extraordinary rate of return of nearly 375% on a total contribution of approximately €390 million toward the acquisitions of TIM Hellas and Q-Telecom. This also represented a staggering 1,823% return on the equity component of TPG's and Apax's contribution (*i.e.*, their contributions in exchange for CPECs and ordinary shares). Although the acquisitions of TIM Hellas and Q-Telecom had proven to be extremely profitable for TPG and Apax, the same could not be said for the Company. The sale to Weather Investments did nothing to ameliorate the Company's debt burden or its insolvency, and the Company continued to struggle with high interest-payment obligations.

147. The Company's financial statements for the year ended December 31, 2007 recorded a loss of more than €71.2 million. Although the Company reported net operating income of approximately €216.4 million, it remained less than the Company's debt-service obligations, which had continued to grow to a net financial loss of more than €259.5 million. The Company's financial statements explained that its net financial expenses increased year-over-year "mainly due to increase of the [the] company's indebtedness during 2007 as well as due to the increase in interest rates." The Company's leverage remained high at 12.4x EBIT, while its cash interest coverage declined to 1.2x EBIT.

148.    Meanwhile, on or about June 5, 2008, Apax Partners paid €500 million to Weather Investments (the same amount Weather Investments had paid to acquire the Company in 2007) and received a 5% equity stake in Weather Investments. Deutsche Bank (or an affiliate thereof) and Citigroup (who both had financed the 2007 acquisition of the Company by Weather Investments) served as financial advisors in connection with Apax Partners's acquisition of a minority stake in Weather Investments.

149.    The Company continued to be plagued by its massive debt burdens until it entered administration in 2009. The Company's financial statements for the year ended December 31, 2008 recorded another loss, this time of more than €131.9 million, and net financial expenses in excess of €371.4 million. The Company's continued losses widened its negative equity balance to almost €1.2 billion, while total liabilities increased.

150.    In early 2009, the Company engaged financial advisors to investigate a potential restructuring as it struggled to bear the continuing burdens of high leverage and constrained liquidity. In August 2009, and in anticipation of a potential restructuring, the Company moved its center of main interests from Luxembourg to the United Kingdom, including among other steps by moving its head office and operating office to London, England. On November 26, 2009, the High Court approved placing the Company into administration in England and appointed joint administrators (the "Administrators").

151.    In its decision dated November 30, 2011 (the "November 30 Opinion"), given effect by Order dated December 1, 2011, the High Court discharged the Administrators and, rather than approving the dissolution of the Company, ruled that it should be wound-up through a compulsory liquidation. The High Court's November 30 Opinion found in part that "it has not been established that [the Administrators] have managed to get fully to the bottom of events and

to lay out clearly to view the reasons why Hellas II suffered the very large and catastrophic losses it did."

152.    The High Court's November 30 Opinion further explained that the circumstances surrounding the December 2006 Transaction and the December 2006 CPEC Redemption called for investigation by the Joint Compulsory Liquidators:

> Although there may be good reasons to think that the redemption of the CPECs in December 2006 was pursuant to a market valuation of the Hellas group properly arrived at (when compared with the success of the issue of the notes and the price paid by the Weather group shortly thereafter), the document containing the valuation by the management of Hellas II has not in fact been located, nor does it appear that the management has given a clear explanation of the basis or justification for the valuation they seem to have made. In my view, there is clearly scope for such issues to be probed further, if a liquidator takes the view that they should be.

153.    Having probed further, the Joint Compulsory Liquidators determined that the evidence shows that the December 2006 Transaction and the December 2006 CPEC Redemption were not the product of "a market valuation of the Hellas group properly arrived at," but instead were part of a unified scheme to distribute nearly €1 billion in funds borrowed by the Company and its affiliates to TPG and Apax, which left the Company insolvent, with unreasonably small capital with which to conduct its business, and unable to pay its debts as they matured, at the expense of the Company and its creditors, including in particular the holders of the Sub Notes. The Joint Compulsory Liquidators seek to recover the ill-gotten gains seized by TPG and Apax.

## FIRST CAUSE OF ACTION
### (Actual Fraudulent Conveyance Against All Defendants
### and the Transferee Class – N.Y. Debt. & Cred. Law § 276)

154.    Plaintiffs repeat and reallege the allegations above in paragraphs 1 through 153 inclusive as if fully set forth herein.

155.    Through the December 2006 Transaction and the December 2006 CPEC Redemption, the Company transferred approximately €1.57 billion in cash proceeds to its parent Hellas I, of which at minimum €973,657,610 was transferred to the Sponsors including defendant Apax Nominees, and transferred from the Sponsors, directly or indirectly, to the defendants named herein and the Transferee Class.  Through the Consulting Fees Transfer, the Company transferred at minimum an additional €1.2 million to TPG and Apax on or after December 21, 2006.

156.    As a result of the issuance of the Sub Notes as part of the December 2006 Transaction, the Company became liable and indebted to the holders of the Sub Notes, which liability was in the amount of at least €960 million and $275 million at the time of the December 2006 CPEC Redemption and the Consulting Fees Transfer.

157.    The December 2006 CPEC Redemption and the Consulting Fees Transfer were made by the Company, by and through its sole manager Hellas and the members of the Board of Managers of Hellas, with the actual intent to hinder, delay and/or defraud the present and future creditors of the Company, and in particular the holders of the Sub Notes, which intent and belief is demonstrated by, among other things, that:

(a)    the December 2006 CPEC Redemption was agreed to, approved, and facilitated by the Company, its sole manager Hellas, and the members of the Board of Managers of Hellas, in knowing disregard of the fact that the

Company was insolvent or would be rendered insolvent thereby, and of the foreseeable disastrous consequences for the Company and its creditors, and in particular the holders of the Sub Notes;

(b)    the December 2006 CPEC Redemption was carried out in knowing violation of the plain terms governing the CPECs and notwithstanding that no such redemption was required until, if ever, at maturity of the CPECs, and that none of the mandatory prerequisites for such an Optional Redemption prior to maturity had been satisfied;

(c)    the Optional Redemption Price for the December 2006 CPEC Redemption was set at more than 35 times par value, without a good-faith, arm's-length determination of market value, and in knowing violation of the terms governing the CPECs;

(d)    the draft Offering Memorandum for the Sub Notes was knowingly amended to strike any requirement that the Company obtain an independent appraisal before fixing the Optional Redemption Price for the December 2006 CPEC Redemption, and no such independent appraisal was ever obtained or conducted for that purpose;

(e)    the Offering Memorandum falsely characterized the December 2006 CPEC Redemption as a repayment of "deeply subordinated shareholder loans," in knowing and willful concealment of the true nature of the December 2006 CPEC Redemption as a distribution of €973.7 million to the defendants without consideration;

54

(f)     the Consulting Fees Transfer was made in knowing disregard that the Company was insolvent or would be rendered insolvent thereby, and that TPG and Apax continued to siphon assets from the Company rather than providing any "consulting" or "management" services of reasonably equivalent value; and that

(g)     the December 2006 CPEC Redemption and the Consulting Fees Transfer were carried out in knowing disregard that TPG and Apax would improperly benefit therefrom, and that this benefit would come at the expense and to the detriment of the Company and its creditors, and in particular the holders of the Sub Notes.

158.    The proceeds from the December 2006 CPEC Redemption and the Consulting Fees Transfer were accepted by TPG and Apax with knowledge of that wrongful and fraudulent intent, as the December 2006 CPEC Redemption and the Consulting Fees Transfer were orchestrated by and carried out at the direction of those same defendants.

159.    The December 2006 CPEC Redemption and the Consulting Fees Transfer should be avoided, set aside, and recovered pursuant to N.Y. Debt. & Cred. Law §§ 276 and 278, and 11 U.S.C. §§ 1521(a)(5) and (a)(7).

### SECOND CAUSE OF ACTION
**(Constructive Fraudulent Conveyance Against All Defendants and the Transferee Class – N.Y. Debt. & Cred. Law §§ 273, 274, 275, and 277)**

160.    Plaintiffs repeat and reallege the allegations above in paragraphs 1 through 159 inclusive as if fully set forth herein.

161.    Through the December 2006 Transaction and the December 2006 CPEC Redemption, the Company transferred approximately €1.57 billion in cash proceeds to its parent

Hellas I, of which at minimum €973,657,610 was transferred to the Sponsors including defendant Apax Nominees, and transferred from the Sponsors, directly or indirectly, to the defendants named herein and the Transferee Class.

162.    The December 2006 CPEC Redemption was a dividend or distribution to shareholders devoid of any consideration.  Even if the December 2006 CPEC Redemption had involved the Company's satisfaction of an antecedent debt (which it did not), it was made without fair or adequate consideration because the CPECs were redeemed at a premium of €951.3 million over their aggregate par value.

163.    Through the Consulting Fees Transfer, the Company transferred at minimum €1.2 million to TPG and Apax on or after December 21, 2006.  The Consulting Fees Transfer was made without fair or adequate consideration, including because TPG and Apax provided no "consulting" or "management" services of value to the Company or its subsidiaries.

164.    As a result of the December 2006 CPEC Redemption and the Consulting Fees Transfer, the Company was left insolvent as the present fair salable value of the Company's assets was less than the amount that would be required to pay the Company's probable liability on its existing debts as they became absolute and matured.

165.    As a result of the December 2006 CPEC Redemption and the Consulting Fees Transfer, the Company's remaining assets at that time constituted an unreasonably small capital with which to engage in its business, and the Company did not retain sufficient capital with which to meet its general obligations, and in particular the obligations owed by the Company to the holders of the Sub Notes.

166.    At the time of the December 2006 CPEC Redemption and the Consulting Fees Transfer, the Company believed, by and through Hellas and the members of the Board of

Managers of Hellas, that the Company would incur liabilities and debts to the creditors of the Company, and in particular the holders of the Sub Notes, beyond the Company's ability to pay as those liabilities and debts matured.

167.     The December 2006 CPEC Redemption and the Consulting Fees Transfer should be avoided, set aside, and recovered pursuant to N.Y. Debt. & Cred. Law §§ 273, 274, 275, 277, and 278, and 11 U.S.C. §§ 1521(a)(5) and (a)(7).

**THIRD CAUSE OF ACTION**
**(Unjust Enrichment Against TPG and Apax)**

168.     Plaintiffs repeat and reallege the allegations above in paragraphs 1 through 167 inclusive as if fully set forth herein.

169.     By their wrongful acts, statements and omissions, and through the wrongful diversion and receipt of proceeds from the December 2006 Transaction, the December 2006 CPEC Redemption, and the Consulting Fees Transfer, TPG and Apax have unjustly retained benefits that belong to the Company, and their retention of those benefits violates fundamental principles of justice, equity and good conscience.

170.     TPG and Apax are therefore liable to the Company for unjust enrichment.

171.     Plaintiffs seek restitution from TPG and Apax and an order of this Court disgorging all payments, profits, fees, benefits, incentives and other compensation obtained by TPG and Apax as a result of their wrongful conduct.

172.     By virtue of the foregoing, TPG and Apax are liable to reimburse the Company's estate the amount of all the payments, profits, fees, benefits, incentives and other compensation they received in connection with the December 2006 Transaction, the December 2006 CPEC Redemption, and the Consulting Fees Transfer.

## RELIEF REQUESTED

**WHEREFORE**, by reason of the foregoing, Plaintiffs respectfully request that this Court enter judgment against the defendants as follows:

(a)    certifying the Transferee Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b)    awarding Plaintiffs damages in an amount to be determined at trial;

(c)    adjudging the December 2006 CPEC Redemption and the Consulting Fees Transfer fraudulent, avoided, and set aside;

(d)    granting recovery from all defendants and the Transferee Class of all amounts paid in connection with the December 2006 CPEC Redemption;

(e)    granting recovery from TPG and Apax of all amounts paid in connection with the Consulting Fees Transfer;

(f)    imposing a constructive trust on assets of TPG and Apax in the amount of all proceeds received by each such defendant in connection with the December 2006 Transaction, the December 2006 CPEC Redemption, and the Consulting Fees Transfer;

(g)    awarding Plaintiffs their attorneys' fees pursuant to N.Y. Debt. & Cred. Law § 276-a, plus the costs and other expenses incurred in this action;

(h)    awarding Plaintiffs pre- and post-judgment interest at the legal rate; and

(i)    awarding Plaintiffs such other and further relief as this Court may deem just and proper.

Dated:  March 13, 2014
New York, New York

Respectfully submitted,

CHADBOURNE & PARKE LLP

By _____

    Howard Seife
Thomas J. McCormack
Andrew Rosenblatt
Marc D. Ashley

30 Rockefeller Plaza
New York, NY  10112
(212) 408-5100
hseife@chadbourne.com

*Attorneys for Plaintiffs as against all
Defendants Except Deutsche Bank AG
and Nikesh Arora*

Respectfully submitted,

WOLF HALDENSTEIN
ADLER FREEMAN & HERZ LLP

By _____

    Eric B. Levine
Alexander H. Schmidt

270 Madison Avenue
New York, NY  10016
(212) 545-4730
Levine@whafh.com

*Attorneys for Plaintiffs as against Defendants
Deutsche Bank AG and Nikesh Arora*

59